Charles JOHNSON and Karen Johnson,
Plaintiffs-Appellants,

v.

ROGERS MEMORIAL HOSPITAL, INC.,
Defendant-Respondent,

HEARTLAND COUNSELING SERVICES
and South Street Clinic, Defendants,

Kay PHILLIPS, Ph.D., Jeff Hollowell,
Tim Reisenauer, and Wisconsin Patients
Compensation Fund, Defendants-Respondents.

Supreme Court

*Nos. 2003AP784, 2003AP1413.*
*Oral argument November 3, 2004.*
*—Decided July 8, 2005.*

2005 WI 114

(Also reported in 700 N.W.2d 27.)

For the plaintiffs-appellants there were briefs by *William Smoler* and *Smoler Law Office, LLC,* Monona, and oral argument by *William Smoler.*

For the defendant-respondent, Rogers Memorial Hospital, Inc., there was a brief by *Laurie J. McLeroy* and *Otjen, Van Ert, Lieb & Weir, S.C.,* Milwaukee, and oral argument by *Laurie J. McLeroy.*

For the defendant-respondent, Kay Phillips, Ph.D., there was a brief by *David McFarlane, Francis X. Sullivan* and *Bell, Gierhart & Moore, S.C.,* Madison, and oral argument by *David McFarlane.*

For the defendants-respondents, Drs. Jeff Hollowell and Tim Reisenauer, there was a brief by *Bradway A. Liddle, Jr., Sarah A. Zylstra* and *Boardman, Suhr, Curry & Field, LLP,* Madison, and oral argument by *Sarah A. Zylstra.*

¶ 1. LOUIS B. BUTLER, JR., J. This case stems from allegations that therapists implanted and reinforced in a patient false memories of childhood physical and sexual abuse committed by the patient's parents. The patient, Charlotte, has since accused her parents, Charles and Karen Johnson (Johnsons) of being child abusers and disassociated herself from them. The Johnsons commenced an action against, among other parties, her therapists for negligent treatment, but the action has been impeded by Charlotte's refusal to waive her therapist-patient privilege.

¶ 2. We accepted the court of appeals' certification to determine whether there should be an exception to the therapist-patient privilege when an adult child

389

accuses her parents of physical and sexual abuse based on memories recovered during therapy, and the parents sue the child's therapists for infliction of emotional harm. The Johnsons submit that this court need not reach that issue, because they argue Charlotte waived her privilege or, in the very least, did not have a privilege with respect to communications made to an unlicensed therapist.

¶ 3. We conclude that Charlotte did not waive her therapist-patient privilege, as she did not disclose any significant part of a confidential matter or communication.[1] We further conclude that Charlotte's communications with the unlicensed therapist were privileged because of Charlotte's reasonable expectation that they would be and because the unlicensed therapist worked under the direction of a physician.[2]

¶ 4. In response to the court of appeals' certified question, we conclude that there is a public policy exception to the therapist-patient privilege and to the confidentiality in patient health care records where negligent therapy causes false accusations against the parents for sexually or physically abusing their child. The exception is not unlimited and is implicated only where the plaintiff can establish a reasonable likelihood that negligent therapy occurred and the trial court agrees that the records contain relevant information regarding negligent treatment after conducting an in camera review. In those limited instances, the trial court must disclose those records to the plaintiff, and

---

[1] Chief Justice Shirley S. Abrahamson, Justices Ann Walsh Bradley and Louis B. Butler, Jr. agree with this conclusion. Justices Jon P. Wilcox, N. Patrick Crooks, and David T. Prosser conclude that Charlotte waived her privilege. Justice Patience Drake Roggensack did not participate.

[2] All participating justices agree with this conclusion.

the privilege and confidentiality associated with those particular records is removed.[3] Therefore, we reverse the circuit court's order and remand this case for further proceedings.[4]

I

¶ 5. This is the second time this case is before this court. *See Johnson v. Rogers Memorial Hosp., Inc.,* 2001 WI 68, 244 Wis. 2d 364, 627 N.W.2d 890 (*Johnson II*). The factual record is still relatively sparse, as this case was first before this court after a motion to dismiss, and is again before us after limited discovery was conducted following this court's reversal of the order granting the motion to dismiss and remand to the circuit court. For completeness, the following factual background discussion is taken from *Johnson II,* with supplementations from the discovery that has since occurred.

¶ 6. In late summer or fall of 1991, the Johnsons' daughter, Charlotte, began psychotherapy treatment

---

[3] Justices N. Patrick Crooks, David T. Prosser and Louis B. Butler, Jr. agree with this conclusion. Chief Justice Shirley S. Abrahamson and Justices Jon P. Wilcox and Ann Walsh Bradley conclude that there is no public policy exception.

[4] Three Justices, N. Patrick Crooks, David T. Prosser, and Louis B. Butler, Jr., agree with the in camera procedure under a public policy exception, irrespective of their positions regarding waiver. One Justice, Jon P. Wilcox, concludes that there is no need for an in camera review because of Charlotte's waiver. Because there are four votes that would allow the Johnsons to proceed on their claim, and because the votes for in camera review represent the least restrictive means of enforcing this decision, the trial court should proceed, for purposes of this proceeding only, with the in camera review procedures described *infra.*

with Kay Phillips and Heartland Consulting Services. *Id.,* ¶ 2. Shortly after that, Phillips referred Charlotte to Rogers Memorial Hospital for treatment for eating and addictive disorders and for sexual and physical abuse issues. *Id.* Charlotte was admitted as an inpatient to Rogers Memorial in early November 1991 and remained there until nearly the end of the month. *Id.,* ¶¶ 2–3.

¶ 7. At Rogers Memorial, Charlotte received therapy from Jeff Hollowell and Tim Reisenauer, both licensed psychologists under Wis. Stat. ch. 455 at all relevant times, during which she developed the belief that Charles raped her and Karen physically abused her as a young child.[5] *Id.,* ¶ 3. Charlotte confronted Charles about this abuse on November 22, 1991, and confronted Karen on October 28, 1993. *Id.,* ¶ 3.

¶ 8. Although the Johnsons denied the abuse occurred, Charlotte terminated her relationship with her parents. *Id.,* ¶ 4. The Johnsons have been unsuccessful in reestablishing any relationship with her, and Charlotte continues to believe that her parents abused her. *Id.*

¶ 9. On May 29, 1996, the Johnsons filed a complaint against the defendants alleging, among other claims, that Phillips, Hollowell, and Reisenauer provided negligent treatment that resulted in Charlotte falsely believing that she had been sexually and physically abused by her parents as a young child. *Id.,* ¶ 5. Without counseling Charlotte to determine the validity of these memories, even after the Johnsons indicated

---

[5] At her deposition, Charlotte also stated she now believes that her paternal grandfather raped her. Additionally, regarding the physical abuse, Charlotte indicated she believed her mother beat her using fists and tried to kill her with a knife and by drowning.

the memories were unfounded, the Johnsons asserted that the therapists' continuous negligent therapy reinforced these false memories. *Id.*

¶ 10. After a series of motions to dismiss, the Dane County Circuit Court, the Honorable Daniel R. Moeser, eventually dismissed the Johnsons' complaint for, as relevant here, failing to state a claim upon which relief could be granted. *Id.,* ¶¶ 9–10. The Johnsons appealed, and in the meantime this court decided *Sawyer v. Midelfort,* 227 Wis. 2d 124, 129, 136, 595 N.W.2d 423 (1999), which recognized a parent of an adult child's third-party professional negligence claim against a therapist for therapy that resulted in implanting and reinforcing false memories of sexual abuse in their child.

¶ 11. Notwithstanding *Sawyer,* the court of appeals affirmed the circuit court. *Johnson v. Rogers Memorial Hosp., Inc.,* 2000 WI App 166, 238 Wis. 2d 227, 616 N.W.2d 903 (*Johnson I*). The court of appeals noted that the Johnsons did not have Charlotte's medical records. *Id.,* ¶ 11. The court of appeals also believed that Charlotte neither waived her right to maintain their confidentiality, nor relinquished her privilege to retain the privacy of her communications with the therapists. *Id.* Thus, the court of appeals determined that the Johnsons could not prove their claim, nor could the therapists defend against it, without imposing significant collateral burdens on the therapist-patient confidential relationship. *Id.,* ¶ 12. Due to the public policy underlying the patient-therapist privilege, the court of appeals concluded that a patient's records cannot be fair game whenever a suit of this kind was commenced. *Id.,* ¶ 17.

¶ 12. This court reversed, determining that resort to public policy was premature because the record did

not clearly indicate whether a burden would be placed on therapist-patient confidentiality. *Johnson II,* 244 Wis. 2d 364, ¶ 18. Specifically, this court found the record unclear as to whether Charlotte waived her privilege or whether a privilege applied at all under the circumstances. *Id.,* ¶¶ 18–19. The matter was remanded to the circuit court to further develop the record.

¶ 13. On remand, the following factual record was developed regarding whether a privilege applied to Charlotte's therapy with Phillips. During Charlotte's therapy with Phillips, Phillips was not certified as a professional counselor pursuant to Wis. Stat. § 457.12. In fact, Phillips did not receive her certification until March 21, 1995.

¶ 14. While treating Charlotte, however, Phillips was supervised by Dr. David Israelstam, a licensed psychiatrist who supervised all the therapists at Heartland Counseling. Once a month, for one hour, Israelstam met with the four or five therapists so that they could present their cases and diagnoses. Israelstam would then sign-off on the diagnoses if he agreed with it. Israelstam also indicated he had continued supervision over cases depending on the frequency with which the patient met with the therapist. He reviewed the case in the same manner described above every 90 days if the patient was seen once a week or less and every 30 days if the patient was seen twice a week or more. He also stated he was screening the cases to determine if medications were or hospitalization was necessary.

¶ 15. Sometime in April 1992, Charles went to Phillips' office and attempted to interrupt one of Charlotte's therapy sessions. As a result, the police were called.

¶ 16. The factual record was also developed on remand regarding whether Charlotte waived her privilege. The Johnsons submitted affidavits that averred that Charlotte's confrontations regarding the alleged abuse occurred during Charlotte's therapy sessions at Rogers Memorial Hospital. They further asserted that in addition to Charlotte, Reisenauer, and Hollowell being in the room during the confrontation, another patient, Charlotte's "silent advocate," was present.

¶ 17. Charles' affidavit stated that in late 1991 and early 1992, he agreed to help Charlotte pay for her therapy and began receiving billing statements from the defendants. The bills detailed the dates and times Charlotte underwent therapy as well as who provided therapy.

¶ 18. Charles also produced an authorization for records release that Charlotte signed in February 1992 while an inpatient at St. Mary's Hospital for psychiatric problems. The release form contained check boxes that allowed the patient to decide what type of information to be released. Charlotte did not mark the box for "Records relating to treatment for psychiatric condition," but rather marked the box for "The specific information listed here." Next to this marked box, Charlotte wrote "medical (physical) test results; medications prescribed; general progress."

¶ 19. Based on the release, Charles received Charlotte's psychiatric admission note, consultation notes, and the discharge summary. The psychiatric admission note indicated that Charlotte was recently treated at Rogers Memorial for an eating disorder. The note goes on to explain:

> She has been flooded with memories of what she recalls as a sexual rape by her father when she was 3 years old, along with physical and emotional abuse by her mother

395

when she was a child. She found the Rogers program quite helpful during the 3–4 weeks she was there. She was then in an outpatient program on the grounds, attending groups and living in home with other patients without staff present. She then had an episode where she started screaming for 4 hours, with recall of abuse by her mother. She was seen as impulsive by the medical staff at Rogers and was not allowed reentry.

The medical note similarly stated:

She has been experiencing flashbacks related to abuse as a child. She was a victim of sexual abuse by her father at age 3. She was the victim of repeated physical abuse by her mother throughout her childhood. She also was a victim of emotional abuse from both parents throughout her childhood and adolescent years. . . . She also has an eating disorder in which she overeats. . . . She was hospitalized at Rogers Memorial Hospital from November through December 1991 for this eating disorder. . . . Since her discharge from Rogers Institute in December, she continues to have increasing flashbacks. During these flashbacks, she becomes very emotionally distraught and suicidal.

The discharge summary, written by Dr. Israelstam, identified Phillips as the person who referred Charlotte for admission to St. Mary's Hospital.

¶ 20. The Johnsons also presented Charlotte's June 1992 restraining order petition. Charlotte's grounds for the petition read:

Because of past physical, emotional, and sexual abuse as a child perpetrated by my parents (Charles and Karen) and subsequent confrontation with my father in Nov. of 1991, I have experienced severe stress and anxiety.

The restraining order was extended in July 1993, after Charlotte wrote to the court that "[t]he respondents,

my parents (Charles J. and Karen K. Johnson) are perpetrators of incest and physical abuse which has created a condition diagnosed by my physicians as post-traumatic stress disorder."

¶ 21. The Johnsons additionally established that Charlotte considered other legal action. In the beginning of January 1994, Charlotte retained an attorney to explore her options for seeking a civil remedy against the Johnsons for the childhood abuse she believed she suffered. Her attorney communicated with the Johnsons and their attorney regarding settling this possible claim. In one response letter, Charlotte's attorney wrote:

> I have handled cases such as this for many years. I have conversed with and/or corresponded with some of the finest, unbiased minds in both the legal and medical/psychological communities. I have no doubts as to the validity of repressed memories. Therefore, if your letter was intended to impress me, it has failed.

After various offers of settlement letters were exchanged, it seems that no further action was taken on the possible lawsuit.

¶ 22. In addition to discovering the above facts, the Johnsons deposed Phillips, Hollowell, and Reisenauer. All three therapists asserted privilege and refused to answer questions regarding treatment they provided Charlotte. The Johnsons also deposed Charlotte, but she too asserted her privilege.

¶ 23. The Johnsons did, however, obtain an affidavit from a high school friend of Charlotte's, Nidhi Jain. Jain stated that after Charlotte began therapy, she visited Charlotte in June 1992. Although Jain could not remember many specifics of the conversations with Charlotte, Jain remembered Charlotte saying that she was seeing a therapist and was being hypnotized as part of her therapy.

¶ 24. Following this discovery, Hollowell and Reisenauer moved for summary judgment. They asserted that they were bound to abide by Charlotte's invocation of privilege; the Johnsons could not prove their claim with Charlotte claiming privilege; and public policy otherwise required protecting the therapist-patient privilege. Rogers Memorial and Phillips advanced similar reasons in their motions for summary judgment, while Phillips also argued her records from Charlotte's therapy were confidential because prior to the time she became a licensed counselor on March 21, 1995, she practiced under the direction and supervision of a licensed psychiatrist, Israelstam.

¶ 25. The Johnsons moved to compel access to Charlotte's records, asserting that a public policy exception should be created to the therapist-patient relationship in cases like this. Alternatively, the Johnsons claimed that confidentiality did not apply to Phillips' records, and Charlotte otherwise waived her privilege and confidentiality rights by: (1) signing the limited release for her records; (2) providing medical bills to her parents that related to her treatment; (3) confronting her parents about the abuse during her therapy sessions; (4) telling her high school friend, Jain, that she was in therapy and being hypnotized; (5) filing a restraining order against her parents; (6) communicating with an attorney about commencing a suit against her parents for the abuse she believed she suffered.

¶ 26. The circuit court, the Honorable Daniel R. Moeser, denied the Johnsons' motion and eventually granted the defendant's summary judgment motions. The court declined the Johnsons' invitation to create a new exception to the therapist-patient privilege for cases such as these for four reasons.

¶ 27. First, the court began by acknowledging there is an exception to confidentiality of records in Wis. Stat. § 146.82(2)(a)11 (2001–02)[6] when child abuse is suspected, but noted that this exception related narrowly to the disclosure of health records to the sheriff, police department, or district attorney for purposes of investigation or prosecution. Second, the court agreed with the Johnsons that privileges in general are to be narrowly construed, but concluded that the trend has been to expand the categories of health care providers covered by the privilege. Third, the court acknowledged the Johnsons' claim that there is little evidence that the "dangerous patient"[7] exception to privilege and confidentiality caused psychotherapy to be less effective. Nevertheless, the court was persuaded that the general importance of maintaining the confidentiality of medical records surpassed the need for disclosure. Fourth, the court recognized that *Sawyer* gave third parties a cause of action against therapists for negligent therapy. However, the court was not persuaded that the therapist-patient privilege will generally impair the cause of action, because in many other cases the patient may have already waived the privilege or otherwise made the medical records available.

¶ 28. Turning to waiver, the circuit court disagreed that Charlotte waived her privilege. Regarding Phillips' lack of licensure, the court noted that the court of appeals in *Locke* held that the key consideration for privilege is the "patient's objectively reasonable perceptions and expectations of the medical provider." *State v.*

---

[6] All references to the Wisconsin Statutes are to the 2001–02 version, unless otherwise noted.

[7] *See Schuster v. Altenberg,* 144 Wis. 2d 223, 424 N.W.2d 159 (1988), and *Tarasoff v. Regents of University of California,* 551 P.2d 334 (Cal. Rptr. 1976).

*Locke,* 177 Wis. 2d 590, 604, 502 N.W.2d 891 (Ct. App. 1993). The court found that the Johnsons had not presented any evidence to establish Charlotte did not expect her communications with Phillips to be privileged. Concerning the release of the various medical records and therapy bills and Charlotte's disclosure that she was being hypnotized to Jain, the circuit court concluded that none of these disclosures constituted a "significant part of the matter or communication" under Wis. Stat. § 905.11. With regard to Charlotte's confronting the Johnsons about the abuse during therapy, the court held that the Johnsons' presence, as family members, did not abrogate the privilege. *See* Wis. Stat. § 905.04(2). The court also held that the presence of the "silent advocate" did not invade the privilege because that person was "present to further the interest of the patient" or was "participating in the diagnosis and treatment." *See* Wis. Stat. § 905.04(1)(b). Lastly, the court stated it was not convinced that the restraining order waived Charlotte's privilege.

¶ 29. The Johnsons appealed, and the court of appeals certified the case to us for a public policy determination of whether there ought to be an exception to the therapist-patient privilege when an adult child accuses her parents of physical and sexual abuse based on memories recovered during therapy, and the parents sue the child's therapists under a *Sawyer* third-party claim.

II

¶ 30. This court reviews a circuit court's grant of summary judgment de novo, applying the same methodology as the circuit court. *Green Spring Farms v.*

*Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). The papers filed by the moving party must be carefully scrutinized. *Grams v. Boss,* 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980). All reasonable inferences drawn from the underlying facts contained in these documents that are in the record must be viewed in the light most favorable to the non-moving party. *See id.* However, this court does not resolve issues of fact on summary judgment, but rather decides whether genuine issues of material fact exist. *Id.* at 338.

¶ 31. Whether Charlotte waived her privilege requires the application of undisputed facts to a legal standard. This is a question of law we review de novo. *See Towne Realty v. Zurich Ins. Co.,* 201 Wis. 2d 260, 267, 548 N.W.2d 64 (1996). As a key factual dispute is whether Charlotte underwent recovered memory therapy, we cannot assume for purposes of our waiver discussion that recovered memory therapy occurred.

¶ 32. Additionally, whether public policy requires creating an exception to the therapist-patient privilege in order to sustain a third-party professional negligence cause of action against a therapist is a question of law we review de novo. *See Stephenson v. Universal Metrics, Inc.,* 2002 WI 30, ¶ 42, 251 Wis. 2d 171, 641 N.W.2d 158; *Sawyer,* 227 Wis. 2d at 137; *State v. Hydrite Chem. Co.,* 220 Wis. 2d 51, 59, 582 N.W.2d 411 (Ct. App. 1998).

## III

¶ 33. We begin with an overview of the confidentiality and privilege statutes at issue as well as the principle of waiver. A patient's health care records are confidential pursuant to Wis. Stat. § 146.82(1), which states:

> All patient health care records shall remain confidential. Patient health care records may be released only to the persons designated in this section or to other persons with the informed consent of the patient or of a person authorized by the patient.

In general, "patient health care records" are defined as "all records related to the health of a patient prepared by or under the supervision of a health care provider . . . ." Wis. Stat. § 146.81(4). There are exceptions to this rule. Wis. Stat. § 146.82(2)(a)1.-21. One exception provides that records can be released without the patient's informed consent, however, when required "[u]nder a lawful order of a court of record." Wis. Stat. § 146.82(2)(a)4. *See Crawford v. Care Concepts,* 2001 WI 45, ¶ 2, 243 Wis. 2d 119, 625 N.W.2d 876 (nonprivileged information can be released by order of a court of record).

¶ 34. In addition to the record's confidentiality, Wis. Stat. § 905.04(2) confers on a patient an evidentiary privilege:

> to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition, among the patient, . . . or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the . . . psychologist . . . .

The privilege applies "at all stages of all actions, cases and proceedings." Wis. Stat. § 911.01(3). The purpose of the privilege is to prevent unnecessary disclosure of "confidential" communications. *Steinberg v. Jensen,* 194 Wis. 2d 439, 459, 534 N.W.2d 361 (1995). Section 905.04(1)(b) defines confidential as follows:

> A communication or information is "confidential" if not intended to be disclosed to 3rd persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication or information or persons who are participating in the diagnosis and treatment under the direction of the ... psychologist ... including the members of the patient's family.

¶ 35. While confidentiality under Wis. Stat. § 142.82 is relinquished either by informed consent or by application of an exception, a testimonial privilege is waived where the person "while holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Wis. Stat. § 905.11.

¶ 36. As the court of appeals observed in *State v. Allen,* 200 Wis. 2d 301, 309, 546 N.W.2d 517 (Ct. App. 1996), the information covered by Wis. Stat. § 905.04 and Wis. Stat. § 146.82 will overlap in many instances "because a patient's health care record under § 146.82 may often include a record of a confidential communication between the patient and a health care provider under § 905.04." As the court of appeals in *Allen* stated: "Reading the two statutes in pari materia, they represent a collective statement as to the reach and limits of the confidentiality and privilege which attach to such records or communications." *Id.* at 311. Because a cannon of statutory construction provides that where

the more specific statute ordinarily controls over the more general statute, a patient does not waive the confidentiality in his or her confidential communications absent the more specific and more demanding requirement of furnishing informed consent.

¶ 37. The Johnsons contend Charlotte waived her privilege by: (a) signing the authorization for medical documents release; (b) providing her medical and treatment billing statements; (c) inviting the Johnsons into her therapy sessions for confronting them about the alleged abuse; (d) discussing her therapy with her high school friend, Jain; (e) filing a restraining order against the Johnsons; and (f) relaying certain information to her attorney when she contemplated civil action against the Johnsons for the abuse. We do not agree that any of these actions or disclosures caused Charlotte to waive her privilege.

A

¶ 38. We first consider the limited authorization Charlotte signed for disclosure of certain medical records and the accompanying records the Johnsons received as a result. As previously noted, health care records are confidential and shall not be disclosed absent informed consent or application of one of the exceptions. Wis. Stat. § 146.82.

¶ 39. Charlotte consented to release the "specific information listed here," which was limited to "medical (physical) tests; medications prescribed; general progress." Because Charlotte consented to disclose these records, any accompanying privilege associated with these records is waived.

¶ 40. However, Charlotte's hospitalization was for psychiatric treatment, not physical or medical treatment. Although Charlotte could have provided the Johnsons her records that related to her psychiatric treatment by marking the box on the authorization form that authorized disclosure of "records relating to treatment for psychiatric condition," Charlotte did not do so. Instead, she explicitly limited the authorization's scope. The Johnsons, nonetheless, inadvertently received records relating to Charlotte's psychiatric treatment.

¶ 41. The psychiatric admission note, consultation notes, and the discharge summary all included information regarding Charlotte's prior psychiatric care. Even the psychiatric admission note indicates that Charlotte "is very guarded about her information and does not want it shared with her parents or sisters at this time." As Charlotte clearly did not give her informed consent to release the "records relating to treatment for psychiatric condition," the hospital either should not have disclosed any records containing this type of information or redacted it. The hospital's inadvertence in disclosing these records cannot obviate the need for Charlotte's informed consent to disclose them. Because she did not give such consent, she could not have waived her privilege as to any confidential matter or communication with respect to those records. *See Allen,* 200 Wis. 2d at 310.

¶ 42. Even after viewing the information that was released by the hospital, however, we still are not persuaded that the records constitute a waiver of Charlotte's privilege. At most, the medical documents reveal Charlotte believes she has been a victim of abuse and that she previously underwent therapy at Rogers Memorial in November 1992. There is no discussion of

405

anything she said to her therapist, that her therapist said to her, or the type of therapy she underwent. Under these circumstances, we conclude that none of the records constitute a voluntary disclosure of "any significant part of the matter or communication."

## B

¶ 43. Similar reasoning applies to the medical bills. Although there is an exception for disclosing medical bills without informed consent for billing, collection or payment of claims, Wis. Stat. § 146.82(2)(a)3., it does not follow that releasing these bills constitutes a waiver of the confidential communications made during the rendition of the services that lead to issuing the bill. And the bills themselves that Charlotte gave to the Johnsons simply identify who performed therapy, on which date, and for how long. No substance of any communications is listed on the statements. This does not constitute a disclosure of a significant part of the matter or communication. *See Lane v. Sharp Packaging Systems, Inc.,* 2002 WI 28, ¶ 40, 251 Wis. 2d 68, 640 N.W.2d 788 ("Billing records are communications from the attorney to the client, and producing these communications violates the lawyer-client privilege if production of the documents reveals the substance of lawyer-client communications.").

## C

¶ 44. Regarding Charlotte inviting the Johnsons to the therapy session to confront them about the abuse, Wis. Stat. § 905.04(1)(b) protects communications made to "persons who are participating in the diagnosis and treatment under the direction of the . . .

406

psychologist . . . or professional counselor, including the members of the patient's family." Notably, the Johnsons submit that Charlotte was subjected to negligent therapy given that confrontations are indicia of "recovered memory therapy." As such, the Johnsons have conceded that the confrontations were part of Charlotte's treatment, even though they allege the treatment itself was negligent.

¶ 45. The fact that another person was in the room, the so-called "silent advocate," does not result in a waiver either. Charlotte's deposition reveals that this person was there to support Charlotte. According to Wis. Stat. § 905.04(1)(b), communications made in front of third persons are still confidential provided that the third person is "present to further the interest of the patient." *Id.* The silent advocate's presence, therefore, did not waive Charlotte's privilege.

## D

¶ 46. Jain's affidavit also does not result in a waiver. The general assertions that Charlotte said she was "seeing a therapist" and "being hypnotized," without anything more, cannot reasonably be considered a voluntary disclosure of any significant part of a matter or communication. The privilege protects against disclosure of confidential matters or communications, and no such disclosure of "confidential" matters or communications can be inferred by the affidavit.

## E

¶ 47. Neither does the restraining order constitute a waiver. The Johnsons observe that the allega-

tions made to obtain a restraining order include "[t]hat the respondent engaged in, or based on prior conduct of the petitioner and the respondent may engage in, domestic abuse of the petitioner." *See* Wis. Stat. § 813.12(5)(a)3. As part of her petition for a restraining order, Charlotte attested that her parents were the perpetrators of incest and physical and emotional abuse. A year later, Charlotte asked that the order be extended for another year, writing "my parents . . . are perpetrators of incest and physical abuse which has created a condition diagnosed by my physicians as post-traumatic stress disorder." By making her emotional condition as being a survivor of incest and abuse an element of her restraining order claim, the Johnsons argue Charlotte waived her privilege. We disagree.

¶ 48. The waiver of privilege provision is found in Wis. Stat. § 905.11, and states:

> *A person upon whom this chapter confers a privilege* against disclosure of the confidential matter or communication waives the privilege if the person or his or her predecessor, while holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication. (Emphasis added).

However, Wis. Stat. § 905.04(4)(c) establishes:

> *There is no privilege* under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense. (Emphasis added).

Thus, although Charlotte previously relied on her emo-

tional condition to obtain an injunction, she did not waive her privilege, since she did not have one. As such, there is nothing improper with Charlotte raising her privilege now.

¶ 49. Even if the allegations made in the petition for restraining order could somehow be construed as waiving something, just what was waived? The allegations were that "the respondent engaged in, or based on prior conduct of the petitioner and the respondent may engage in, domestic abuse of the petitioner." She stated that her parents were the perpetrators of incest and physical and emotional abuse. But there was no discussion or disclosure of medical records or treatment obtained, and certainly no disclosure of any "significant part of the matter or communication" between Charlotte and her therapist.

¶ 50. The only item that related to Charlotte's medical condition came a year later, when she sought to extend the restraining order for one year because "my parents . . . are perpetrators of incest and physical abuse which has created a condition diagnosed by my physicians as post-traumatic stress disorder." While Charlotte disclosed the diagnosis, she did not disclose any confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental, or emotional condition. In short, she did not waive her privilege against disclosure of confidential matters or communications.

F

¶ 51. Lastly, the Johnsons argue that Charlotte's communications with her attorney regarding commencing an action against them for civil damages constitutes

a waiver of Charlotte's privilege. During settlement correspondence before any lawsuit was filed,[8] Charlotte's attorney wrote the Johnsons' attorney and stated, "I have no doubts as to the validity of repressed memories." This, the Johnsons contend, constitutes a waiver. We do not agree.

¶ 52. Charlotte's attorney's statement suggests Charlotte discussed the type of therapy she underwent. That communication, however, was also privileged. *See* Wis. Stat. § 905.03(2) (attorney-client privilege); Wis. Stat. § 905.11 (no waiver where subsequent communication is itself privileged). And because Charlotte was the holder of the attorney-client privilege, her attorney could not waive her privilege without her consent. *See* Wis. Stat. § 905.03(3); *see also Harold Sampson Children's Trust v. Linda Gale Sampson 1979 Trust,* 2004 WI 57, ¶ 46, 271 Wis. 2d 610, 679 N.W.2d 794 ("[O]nly the client can waive the attorney-client privilege under Wis. Stat. § (Rule) 905.11 regarding attorney-client privileged documents."). With there being no indication of Charlotte's consent, Charlotte's attorney could not have waived her therapist-patient privilege in the context of their attorney-client relationship.

## IV

¶ 53. The Johnsons next contend that even if Charlotte did not waive her privilege, she has no privilege with regard to communications made to Phillips, as Phillips was not a licensed professional therapist until March 21, 1995, nearly four years after she began treating Charlotte. We disagree for two reasons.

---

[8] The lawsuit was never filed.

¶ 54. As noted above, Wis. Stat. § 905.04(2) creates a privilege for communications made between the patient and the patient's physician, registered nurse, chiropractor, psychologist, social worker, marriage and family therapist, professional counselor, or other persons participating in the diagnosis or treatment of the patient under the direction of the above-mentioned personnel. In *Locke,* 177 Wis. 2d 590, the court of appeals concluded that a defendant's statements to a social worker, a profession not explicitly listed under § 905.04(2), were privileged because the defendant reasonably believed that the social worker was working under the supervision of a psychiatrist. The court of appeals noted that "[t]he patient's objectively reasonable perceptions and expectations of the medical provider are the proper gauge of the scope of the sec. 905.04 privilege." *Id.* at 604 (citation omitted).

¶ 55. We conclude that Charlotte reasonably believed her communications with Phillips would be confidential with Phillips. Another individual, whose name Charlotte was advised by her attorney not to disclose on privilege grounds, referred Charlotte to Phillips for psychotherapy. Phillips presented herself as a psychotherapist and provided therapy through "Heartland Counseling Services and the Wisconsin Psychotherapy and Healing Center." Additionally, Charles attempted to interrupt one of Phillips' counseling sessions with Charlotte, only to be escorted off the premises by the police. Given these circumstances, sufficient evidence supports the conclusion that Charlotte reasonably believed her communications with Phillips would remain confidential.

¶ 56. Aside from Charlotte's reasonable expectations, her communications with Phillips are still privileged because Phillips was working "under the direc-

tion" of a "physician," specifically Israelstam. Wisconsin Stat. § 905.04(1)(d) defines physician as "a person as defined in s. 990.01(28), or reasonably believed by the patient so to be." Wisconsin Stat. § 990.01(28), in turn, defines physician as "a person holding a license or certificate of registration from the medical examining board."

¶ 57. It is undisputed that Israelstam was a licensed psychiatrist. Further, at his deposition, Israelstam stated that he reviewed Phillips' diagnoses once a month and periodically reevaluated each patient's treatment plan. We agree with Phillips that this constitutes working under the direction of a physician.

## V

¶ 58. Finally, the Johnsons argue that this court should create a public policy exception to the therapist-patient privilege and confidentiality for *Sawyer* claims. In *Sawyer* this court determined that there is a third-party negligence claim against a therapist whose treatment allegedly resulted in implanting false memories of child abuse. *See Sawyer,* 227 Wis. 2d at 129, 136. This court left open the question of whether confidentiality could defeat the cause of action in cases where the patient persists in invoking privilege. We agree that public policy requires that the therapist-patient confidentiality and privilege give way to *Sawyer* third-party negligence claims, but only in limited circumstances.

## A

¶ 59. We begin with a discussion of the therapist-patient privilege. It is an evidentiary privilege, which

412

"interfere[s] with the trial's search for the truth[] and must be strictly construed, consistent with the fundamental tenet that the law has the right to every person's evidence." *State v. Echols,* 152 Wis. 2d 725, 736–37, 449 N.W.2d 320 (Ct. App. 1989). We have to be mindful that "this privilege must coexist in a judicial system seeking to find the truth, serve the interests of justice, and have all relevant information available for consideration by the fact-finder." *Crawford v. Care Concepts,* 2001 WI 45, ¶ 15, 243 Wis. 2d 119, 625 N.W.2d 876. Within this framework, we now turn to consider the therapist-patient privilege.

¶ 60. The public policy purpose of the privilege "is to facilitate communication between a patient and his or her health care providers." *Id.,* ¶ 25. The privilege "encourage[s] patients to candidly discuss health concerns with those treating them." *State v. Agacki,* 226 Wis. 2d 349, 357, 595 N.W.2d 31 (Ct. App. 1999).

¶ 61. But the privilege is concerned with more than simply facilitating and encouraging discussion. The United States Supreme Court commented on the psychotherapist-patient privilege in *Jaffee v. Redmond,* 518 U.S. 1, 10 (1996). After noting that the privilege is "rooted in the imperative need for confidence and trust," *id.* (citation omitted), the Court declared:

> Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the

413

mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Id.*

¶ 62. As the Court recognized, the privilege serves as a means to facilitate frank discussion in order to provide "effective psychotherapy," with the ultimate end aimed at "successful treatment." *See id.* When the end is divorced from the means, however, such that "negligent therapy" is left to flourish within the confines of the therapist-patient relationship, the privilege no longer serves its purpose. What was meant to be a device to help care for problems becomes a shelter to protect careless and negligent practices. The privilege cannot be distorted in this manner.

¶ 63. While we recognize the benefit from allowing therapists to diagnose and treat victims of sexual and physical abuse as children, no utility can be derived from protecting careless or inappropriate therapists and their practices. The costs are simply too severe: the therapist is allowed to continue negligently "treating" others, the patient remains disillusioned by the falsehoods, and the accused suffers the torment of being branded a child-abuser. We do not hesitate to conclude that mechanical application of the therapist-patient privilege to allow such results to continue unimpeded ill serves the public.[9]

───

[9] We also note that at oral argument, Reisenauer and Hollowell contended that it is "extremely paternalistic" for this court to be telling people what treatment is beneficial for their problems. Their contention misses the mark, however, because the allegation in this case is that Charlotte is an unsuspecting victim of falsely implanted, and reinforced, memories of par-

B

¶ 64. We next turn to *Sawyer,* the case that recognized third-party professional negligence claims for implanting false memories of child abuse. After recognizing the cause of action, *Sawyer* described the serious and grievous harm associated with being branded a "child abuser." The *Sawyer* court called attention to *Doe v. Archdiocese of Milwaukee,* 211 Wis. 2d 312, 355 n.31, 565 N.W.2d 94 (1997), where this court acknowledged, "Society's justifiable repugnance toward sexual abuse of a child . . . is the reason why a falsely accused defendant can be gravely harmed." *Sawyer,* 227 Wis. 2d at 143 (citation and alterations omitted). The same holds true for false accusations of physical abuse of a child. The *Sawyer* court also pointed out that "[o]thers have observed that it is indisputable that being labeled a child abuser is one of the most loathsome labels in society and most often results in grave physical, emotional, professional, and personal ramifications." *Id.* at 143–44 (citation and alterations omitted).

¶ 65. Considering the seriousness of being falsely accused a child abuser, we remain "quite confident that negligent treatment which encourages false accusations of sexual abuse is highly culpable for the resulting injury." *Id.* at 144. That culpability also weighs in favor of recognizing a public policy exception to the therapist-patient privilege in this case.

---

ticularly horrifying acts. That is to say, the allegation here presumes that the therapy precluded Charlotte from rationally determining whether the therapy was beneficial.

> Finally, we do not intend to suggest that piercing the therapist-patient privilege in these circumstances will remedy all the wrongs that may have occurred. If Charlotte was indeed subjected to negligent therapy, that damage may now be irreparable.

¶ 66. We are also persuaded by this court's previous determination that public policy can overcome the therapist-patient privilege. In *Schuster v. Altenberg,* 144 Wis. 2d 223, 424 N.W.2d 159 (1988), this court upheld a third-party cause of action for a therapist's unreasonable failure to warn third parties of a patient's dangerous condition. *Id.* at 239–40. *Schuster* involved a therapist who did not inform a patient's family, specifically the patient's daughter and husband, of the patient's psychotic condition or its dangerousness. *Id.* at 226. As a result, the patient later was involved in a car accident that caused her death and significant injuries to her daughter. *Id.* at 227. The family sued the therapist for, among other third-party claims, failing to warn them of the patient's condition and its dangerous implications. *Id.* at 229. This court determined the family had a third-party negligence claim. *Id.* at 239–40.

¶ 67. Focusing on whether public policy limited liability, the therapist strenuously argued that the public policy of protecting the confidentiality of therapist-patient communications required precluding liability. *Id.* at 249. In rejecting the therapist's argument, this court acknowledged the valid concern for protecting therapist-patient confidentiality but ultimately focused on the nature of the injury to be remedied. The court stated that the confidentiality of therapist-patient communications "must yield in those limited circumstances where the public interest in safety from violent assault is threatened." *Id.* at 249.

¶ 68. The court also appealed to the various exceptions to the therapist-patient privilege in the evidence code. *Id.* at 250. After observing that there was a

particular exception for mental illness hospitalization proceedings if the psychologist determines that the patient is in need of hospitalization, the court said, "[a]t the very least, the statutory exception to the evidentiary privilege suggests a balance struck by the legislature between patient confidentiality and public safety." *Id.* "More generally," the court continued, "the exception to the general rule of privilege demonstrates that the privilege is not sacrosanct and can properly be waived in the interest of public policy under appropriate circumstances." *Id.* (citation and quotations omitted).

¶ 69. Similar reasoning applies for creating an exception to the therapist-patient relationship in this case. Turning to the injury to be remedied, although *Schuster* involved physical injury, this court has since acknowledged the grievous harm associated with being falsely labeled a child abuser. *See Sawyer,* 227 Wis. 2d at 143–44.

¶ 70. And, as did the *Schuster* court, we observe that both the evidence code and the informed consent statute contain specific exceptions to confidentiality where child abuse is suspected. *See* Wis. Stat. § 146.82(2)(a)11 and Wis. Stat. § 905.04(4)(e). Although the Johnsons concede that neither exception is applicable here (as Charlotte was an adult when she underwent therapy), the exceptions nonetheless suggest a balance struck between confidentiality and investigating and determining whether child abuse has actually occurred. *See Schuster,* 144 Wis. 2d at 251. As the *Schuster* court stated, the exception at a minimum "demonstrates that the privilege is not sacrosanct and can properly be waived in the interest of public policy under appropriate circumstances." Id. (citation and quotations omitted).

## VI

¶ 71. For these reasons, we conclude that public policy requires creating an exception to therapist-patient confidentiality and privilege where negligent therapy is alleged to have caused accusations against parents for sexually or physically abusing their child. Consistent with the significant purposes underlying the privilege, however, we are still concerned with maintaining and protecting the therapist-patient relationship to the greatest extent possible. Along similar lines, we also are sensitive to the implications of requiring a patient's records automatically be surrendered whenever a lawsuit such as this is commenced. Fishing expeditions cannot be allowed. Therefore, we further conclude that an in camera inspection of the patient's records is necessary. For guidance on how to fashion the prerequisites and parameters of this in camera inspection to limit the disclosure of privileged and confidential material, we turn to criminal law.

## A

¶ 72. In *State v. Green,* 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, this court refined and heightened the standard to be applied when criminal defendants seek an in camera review of the victim's therapy records. After agreeing that in informant cases a defendant need only establish that the informant's testimony "may be necessary to a determination of guilt or innocence," this court held that "in light of the strong public policy favoring protection of the counseling records . . . a slightly higher standard is required before the court must conduct an in camera review of privileged counseling records." *Id.,* ¶ 32. That higher standard re-

quired the defendant to "set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant." *Id.,* ¶ 34. The evidentiary showing the defendant must set forth must describe as precisely as possible the information sought. *Id.,* ¶ 33. Information is "necessary to a determination of guilt or innocence" if it "tends to create a reasonable doubt that might not otherwise exist." *Id.,* ¶ 34. Prior to making that showing, the court reaffirmed "a defendant must undertake a reasonable investigation into the victim's background and counseling through other means first before the records will be made available." *Id.,* ¶ 33.

¶ 73. If the defendant satisfies this standard, the trial court reviews the records only if the victim consents to the review. *State v. Solberg,* 211 Wis. 2d 372, 386–87, 564 N.W.2d 775 (1997). If the victim does not consent, there is no in camera review and the victim is barred from testifying. *State v. Shiffra,* 175 Wis. 2d 600, 612, 499 N.W.2d 719 (Ct. App. 1993). If after the in camera review, the circuit court determines that the records contain relevant evidence, it should be disclosed to the defendant if the patient again consents. *Solberg,* 211 Wis. 2d at 386–87.

B

¶ 74. We employ a similar standard here, but modify it for application in a civil proceeding. We conclude the plaintiff must first commence a reasonable investigation into the type of therapy the plaintiff's child underwent before moving for an in camera review. This includes exploring whether the child has already waived the privilege or is otherwise willing to disclose

419

the records. After the investigation, the plaintiff must set forth a good faith fact-specific basis demonstrating a reasonable likelihood that the records contain information regarding negligent treatment. This showing cannot be based on mere speculation or conjecture as to what information is in the records, and the information sought cannot be merely cumulative to that already available to the plaintiff. As part of the showing, the plaintiff should present evidence to provide the trial court with features of the negligent therapy believed at issue to help guide its in camera review.

¶ 75. Here is where we depart from the criminal law standard. If the plaintiff establishes a reasonable likelihood that the records contain information regarding negligent treatment, the circuit court must proceed to conduct an in camera review regardless of the victim's lack of consent. We deviate from the criminal law standard in this respect given the peculiarity of the cause of action at issue here. Again, this case presents a claim that essentially contends that Charlotte is the unsuspecting victim of falsely implanted and reinforced memories. To require Charlotte to give consent to open her medical records makes little sense considering that as a result of the negligent therapy Charlotte understandably wants nothing to do with her parents. We note that our procedure not only allows those who have been wrongfully accused a way to proceed with a *Sawyer* cause of action, but also ultimately enables the court to identify negligent therapists, which can only work to protect future potential victims from such negligent therapy. Bearing this in mind, we conclude that the victim cannot impede the claim.

¶ 76. The same holds true after the trial court concludes its in camera review: If the court finds information relevant to the plaintiff's claim, the court

shall turn that information, and only that information, over to the plaintiffs. The therapist-patient privilege is also overcome, but only with respect to those disclosures. All other records not disclosed retain confidentiality and privileged status.

¶ 77. With this standard at hand, we remand the case to furnish the Johnsons with an opportunity to present a good faith fact-specific basis demonstrating a reasonable likelihood that the records contain information regarding negligent therapy. If the Johnsons satisfy the standard we articulate, the court must conduct an in camera review of Charlotte's records. And if that review uncovers relevant evidence, the trial court must turn that evidence over to the parties and the accompanying privilege is concurrently overcome as to that evidence.

## VII

¶ 78. In sum, we conclude that Charlotte did not waive her therapist-patient privilege. We further conclude that Charlotte's communications with Phillips were privileged because of Charlotte's reasonable expectation that they would be and because Phillips worked under the direction of a physician. However, we conclude that there is a public policy exception to the therapist-patient privilege and to the confidentiality in patient health care records where negligent therapy causes false accusations against the parents for sexually or physically abusing their child. The exception is not unlimited and is implicated only where the plaintiff can establish a reasonable likelihood that negligent therapy occurred and the trial court after conducting an in camera review agrees that the records contain relevant information regarding negligent treatment.

*By the Court.*—Reversed and cause remanded for further proceedings consistent with this opinion.

421

¶ 79. PATIENCE DRAKE ROGGENSACK, J., did not participate.

¶ 80 DAVID T. PROSSER, J. (*concurring*). In our society, sexual abuse of a child ranks among the most heinous crimes a person can commit. *Accord Doe v. Archdiocese of Milwaukee,* 211 Wis. 2d 312, 355, 565 N.W.2d 94 (1997). Charlotte Dawn (Charlotte) openly and repeatedly leveled allegations of child sexual abuse against her father, Dr. Charles Johnson, gravely damaging his personal and professional reputations. She made additional allegations against her mother and her grandfather. Charlotte now asks the court to acquiesce in her efforts to shield the psychotherapists who, Dr. Johnson alleges, implanted Charlotte's memories of abuse. As the lead opinion recognizes, that result would be contrary to public policy.

¶ 81. I join sections I, II, IV, V, and VI of Justice Butler's lead opinion because I agree that there is an exception to therapist-patient confidentiality and privilege where negligent therapy is alleged to have caused accusations against parents for sexually or physically abusing their children. However, I do not agree with Section III or with other statements in the lead opinion that conclude that Charlotte did not waive confidentiality and privilege in this case. I write separately to emphasize that in this case, numerous undisputed facts show that Charlotte waived her privilege of confidentiality by voluntarily disclosing a significant part of the privileged matter.

## I. STANDARD OF REVIEW

¶ 82. Determinations of waiver generally present mixed questions of fact and law. *See Reckner v. Reckner,* 105 Wis. 2d 425, 435, 314 N.W.2d 159 (Ct. App.

1981); *accord State v. Arredondo*, 2004 WI App 7, ¶ 12, 269 Wis. 2d 369, 674 N.W.2d 647 (waiver of right to testify); *Meyer v. Classified Ins. Corp. of Wis.*, 179 Wis. 2d 386, 396, 507 N.W.2d 149 (Ct. App. 1993) (waiver of right to arbitrate). Normally, we uphold a circuit court's findings of fact unless they are clearly erroneous.

¶ 83. In this case, however, the defendants moved for summary judgment, and their motion was granted even though the court acknowledged that there were "material issues of fact." The court entered judgment against the plaintiffs on grounds that "defendants [were] unable to defend against plaintiff's allegations because of the [therapist-patient] privilege."

¶ 84. After reviewing the facts, the circuit court concluded that Charlotte had not waived her privilege against the disclosure of confidential matters or communication under Wis. Stat. § 905.11. This was a legal determination. Thus, the question whether Charlotte waived the therapist-patient privilege comes to us as a question of law, which we review de novo, applying the facts to the legal standard for waiver of privilege. Most of the facts are undisputed, but the circuit court, obeying well-established rules governing motions for summary judgment,[1] construed disputed facts in favor

---

[1] Before the circuit court, all the defendants filed motions to dismiss and Rogers Memorial Hospital filed an alternative motion for summary judgment. The circuit court, while continuing to refer to the defendants' "motion to dismiss," effectively converted the motions to dismiss into summary judgment motions by considering facts outside the pleadings. *See* Wis. Stat. § 802.06(2)(b) ("If on a motion asserting . . . failure of the pleading to state a claim upon which relief can be granted . . . matters outside of the pleadings are presented to and *not excluded* by the court, the motion *shall* be treated as one for

of the nonmoving party—the Johnsons. After performing this analysis, the court "dismissed" the action.

## II. QUESTIONS PRESENTED

¶ 85. This case presents two separate questions of "waiver." The first is whether Charlotte waived the confidentiality applicable to her medical records under § 146.82[2] by causing certain records to be sent to her father for billing purposes and to keep him aware of her "general progress." The second is whether the released medical records, and any other voluntary disclosures Charlotte made, constitute a "significant part" of the privileged matter, thus waiving the therapist-patient confidentiality privilege embodied in Wis. Stat. § 905.04(2).

¶ 86. These two questions are interrelated. As the court of appeals observed in *State v. Allen,* "[i]n many instances, the data covered by these two statutes will overlap because a patient's health care record under § 146.82 may often include a record of a confidential communication between the patient and a health care provider under § 905.04." *State v. Allen,* 200 Wis. 2d 301, 309, 546 N.W.2d 517 (Ct. App. 1996). Section 905.04(2) contains the therapist-patient privilege, protecting "confidential communications made or information obtained or disseminated for purposes of diagnosis

---

summary judgment . . . .") (emphasis added). The lead opinion follows this approach, lead op., ¶¶ 10, 31–51, and so does this concurrence.

[2] "All patient health care records shall remain confidential. Patient health care records may be released only to the persons designated in this section or to other persons with the informed consent of the patient or of a person authorized by the patient." Wis. Stat. § 146.82 (2001–02).

or treatment of the patient's physical, mental or emotional condition . . . ." However, the privilege-holder waives that privilege if she "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Wis. Stat. § 905.11.

¶ 87. Here, Charlotte's voluntary disclosure of a significant part of the privileged matter justifies a *limited* release of her medical records to her parents. The plaintiffs need not have unlimited access to Charlotte's therapy records because parts of the records would not be relevant to this litigation. The lead opinion's condition of in camera review is an appropriate method to determine exactly which records must be released.

¶ 88. In contrast to this concurrence, the lead opinion identifies individual voluntary disclosures that could constitute waiver, but rejects each one in piecemeal fashion. Lead op., ¶¶ 25, 33. These individual disclosures are like pieces in a puzzle. When the puzzle is assembled, the resulting picture leaves little doubt that Charlotte voluntarily waived her privilege of confidentiality. In my view, at least two disclosures relating to litigation would have been sufficient in themselves to effect a waiver of the therapist-patient privilege. But any vestige of uncertainty is removed when the total picture of revelations is compared to commonly recognized features of treatment by recovered memory therapy.

¶ 89. To show the significance of Charlotte's voluntary disclosures, this concurrence will discuss features of recovered memory therapy,[3] and then will discuss the grounds for waiver.

---

[3] The terms "recovered memory therapy" and "repressed memory therapy" are often used interchangeably in the professional literature. *See* Alan W. Scheflin & David Spiegel, *From Courtroom to Couch: Working With Repressed Memory and*

## III. RECOVERED MEMORY THERAPY

¶ 90. This concurrence is not intended to pass judgment on the legitimacy of recovered memory therapy. However, an understanding of commonly practiced methods of recovered memory therapy is essential to any evaluation of whether Charlotte waived her privilege by voluntarily disclosing "any significant part" of the privileged matter. Without understanding the salient features of the privileged matter, it would be nearly impossible to determine whether Charlotte disclosed any significant part of the matter or the communications relating to the matter.

¶ 91. Studies reveal that therapists practicing recovered memory therapy use a wide variety of techniques,[4] including hypnosis, age regression, free narrative recall, flashbacks, body memories, and survivors' groups. *See* Daniel Brown, et al., *Memory, Trauma Treatment, and the Law* 482–83 (W.W. Norton & Co. 1998)[5] (hereinafter Brown, *Memory, Trauma Treatment, and the Law*); Ellen Bass & Laura Davis, *The Courage To Heal* 73–75 (Harper & Row, 1st ed. 1988) (hereinafter Bass, *The Courage to Heal*); Hollida Wakefield & Ralph Underwager, *Return of the Furies: An Investigation Into Recovered Memory Therapy* 128 (Open Court Publishing 1994) (hereinafter Wakefield,

---

*Avoiding Lawsuits,* 21:4 Psych. Clinics of N. Am. at 847, 857 (Dec. 1998). This concurrence refers to "recovered memory therapy." No significance should be ascribed to this word choice.

[4] Because there is no single method of practicing recovered memory therapy, this concurrence summarizes only some of the more commonly practiced features of the technique.

[5] This extensive volume comprehensively reports and summarizes the professional literature in this area. Dr. Israelstam referred to this book in preparation for his deposition in this case.

*Return of the Furies*); Joanne M. Hall & Lori Kondora, *Beyond "True" and "False" Memories: Remembering and Recovery in the Survival of Childhood Sexual Abuse,* 19:4 Advances in Nursing Science (June 1997) (hereinafter Hall, *Beyond "True" and "False" Memories*). Clinicians disagree about which techniques are preferable, or even acceptable. Brown, *Memory, Trauma Treatment, and the Law* at 482–83. However, some observers believe there are certain common patterns running through treatment methods. Wakefield, *Return of the Furies* at 149. This concurrence relates some of these commonalities in an effort to understand Charlotte's disclosures.

¶ 92. For many patients the first step on the road to recovered memories is entering treatment for problems *other* than abuse, such as depression, eating disorders, or marital distress. Cathy Spatz Widom & Suzanne Morris, *Accuracy of Adult Recollections of Childhood Victimization: Part 2 Childhood Sexual Abuse,* 9 Psych. Assessment 34, 42 (Mar. 1997) (hereinafter Widom, *Accuracy of Adult Recollections of Childhood Victimization*); Bass, *The Courage to Heal* at 50, 217–19; Wakefield, *Return of the Furies* at 149; *see generally* Harrison G. Pope Jr. & James I. Hudson, *"Recovered Memory" Therapy for Eating Disorders: Implications of the Ramona Verdict,* 19:2 Int. J. of Eating Disorders (Mar. 1996) (hereinafter Pope, *"Recovered Memory" Therapy for Eating Disorders*). Some therapists question women exhibiting these symptoms about the possibility that they were abused as children. *Id.*

¶ 93. A common thread running through most recovered memory treatment methods is the use of hypnosis. Donald A. Eisner, *The Death of Psychotherapy* 72 (Praeger Publishers 2000); Wakefield, *Return of the Furies* at 128–130. In one recent survey about recovery

of repressed memories of sexual abuse, 97 percent of therapists agreed that "[h]ypnosis is a worthwhile psychotherapy tool." Wakefield, *Return of the Furies* at 133. Almost 90 percent of the respondents had either a master's degree or a Ph.D. "[T]he issue is not *whether* hypnosis is used, but *how* it is used." Brown, *Memory, Trauma Treatment, and the Law* at 519. A critical feature of the hypnotic procedure is a "flashback," or "the reliving of a traumatic experience, or an aspect of trauma, as if it were happening now." Wakefield, *Return of the Furies* at 137–42.

¶ 94. Recovered memory practitioners concede that hypnotized patients are "especially vulnerable to suggestive influence from their doctors," and therefore therapists should not " 'push' their clients to recall [child abuse.]" John G. Watkins, *Dealing With the Problem of "False Memory" in Clinic and Court,* Fall 1993 J. Psych. & Law 297, 301 (hereinafter Watkins, *Dealing With the Problem of "False Memory"*). However, memories of abuse "usually emerge only after much resistance . . . ." *Id.* at 303. A patient recalling abuse may exhibit physical manifestations of terror, including "sweating through" and physically reliving the abuse. *Id.* at 308.

¶ 95. During these physical manifestations, patients may experience "body memories" to "gain information about hypothesized abuse that is not remembered." Wakefield, *Return of the Furies* at 145; *see also* Hall, *Beyond "True" and "False" Memories.* In essence, the patient's physical symptoms correspond to the childhood abuse even without conscious memories. *Id.*

¶ 96. Some therapists believe that once patients recover memories of abuse, they "can get well only if they 'confront the abuser.' " Watkins, *Dealing With the Problem of "False Memory"* at 301. However, there is

dispute over whether this technique is effective. *Id.; see also* Brown, *Memory, Trauma Treatment, and the Law* at 36, 167.

¶ 97. As therapy continues, patients are often asked to make journal entries, keep a diary, or create artwork in an effort to recover more memories. Brown, *Memory, Trauma Treatment, and the Law* at 414–16; Christine Courtois, *Recollections of Sexual Abuse: Treatment Principles and Guidelines* 36–37 (W.W. Norton & Co. 1999); Wakefield, *Return of the Furies* at 145–46; Bass, *The Courage to Heal* at 83. In a related tactic, patients are asked to read books relating to remembered childhood abuse such as *The Courage to Heal*.[6]

¶ 98. Another common technique is to advise the patient to cut off all ties with her family and join a "survivors' group" which becomes the patient's "new family." Wakefield, *Return of the Furies* at 143–44. As *The Courage to Heal* puts it, "It is painful to make a break with your family, but it is even more painful to

---

[6] *The Courage to Heal,* by Ellen Bass and Laura Davis, is one of the seminal texts on recovered memory therapy and is seen as the "Bible" of its practices. Hollida Wakefield & Ralph Underwager, *Return of the Furies: An Investigation Into Recovered Memory Therapy* 133 (1994). It has sold more than 750,000 copies and is used by many practitioners. *Id.* at 133–34. The authors published a companion workbook in 1990 and a revised edition of the main volume in 1996.

The meteoric rise of the recovered memory therapy movement began in 1988 with publication of *The Courage to Heal.* Donald A. Eisner, *The Death of Psychotherapy* 68 (2000). Later, some professionals questioned the legitimacy of *The Courage to Heal* because at the time of its first publication, neither of its authors had any degrees or formal training. *Id.* at 134. But in the late 1980s and early 1990s, the book was at the height of its popularity.

keep waiting for a miracle." Bass, *The Courage to Heal* at 305. The book also notes that some women "have changed their names, casting off any identification with the abuser." *Id.* at 306.

¶ 99. As one of the final steps in the cleansing process, recovered memory therapists and survivors' groups often recommend filing civil lawsuits against the accused abuser.[7] One recent study reported that 1 of every 16 accused parents has a lawsuit filed against him or her, and "[m]any others have been threatened." Wakefield, *Return of the Furies* at 146. Practitioners believe that civil litigation fulfills a double purpose by ensuring that the abuser is held liable for the abuse and providing therapeutic closure for the victim. *Id.* at 147.

¶ 100. Having outlined some of the broad characteristics of the admittedly diverse therapy at issue, I turn to the discussion of waiver.

## IV. WAIVER

### A. Records Release

¶ 101. As the lead opinion correctly notes, patient health care records prepared by "health care providers" are confidential. Wis. Stat. § 146.82(1). The lead opinion appears to assume, without expressly deciding, that Charlotte waived the confidentiality of some of her records because it analyzes whether the information contained in those records constituted a waiver under Chapter 905.

---

[7] "In my experience, nearly every client who has undertaken this kind of suit has experienced growth, therapeutic strengthening, and an increased sense of personal power and self-esteem as a result of the litigation." Bass, *The Courage to Heal* at 310.

¶ 102. Two categories of records are at issue. The first category encompasses Charlotte's billing records from various medical providers. Section 146.82(2)(a)3. specifically authorizes release of records "[t]o the extent that the records are needed for billing, collection or payment of claims." Charlotte repeatedly wrote her father to ask for money and she appears to have sent him some of her bills directly. She wrote her father on February 12, 1992, "you should receive a bill [from Kay Phillips]," and on April 22, 1992, "I will transfer the bills for prior hospitalizations to you . . . I will mail the bills later this week."

¶ 103. While Charlotte may have sent some billing records directly, she undoubtedly caused other billing records to be sent to her father for payment. In his sworn affidavit, Dr. Johnson described the billing records he received from Rogers Memorial Hospital, South Street Clinic, Kay Phillips and her employer, Heartland Counseling Services, Grand Teton Mental Health Consultants (for Dr. Israelstam), St. Marys Hospital, and Waukesha Memorial Hospital. It is unlikely that six different providers would have sent medical bills to Dr. Johnson in St. Louis without Charlotte's explicit authorization. By this authorization, Charlotte waived any applicable privilege under § 146.82 with respect to these records.

¶ 104. A second set of records relates to an intake report filled out upon Charlotte's admittance to St. Marys Hospital. At intake, Charlotte voluntarily filled out a form empowering St. Marys to disclose some of her medical records. The form allows the patient to determine the purpose of the disclosure and to decide exactly what information will be disclosed by checking boxes on the form.

¶ 105. Charlotte indicated that the purpose of disclosure was to show her "progress." She signed a form stating "I hereby request and authorize St. Marys Hospital Medical Center to provide access to my hospital records" to "Dr. Charles Johnson (father)" to show her "progress." This authorization was signed several months *after* she had accused Dr. Johnson to his face of sexually abusing her.

¶ 106. Charlotte also checked the box marked "The specific information listed here," to indicate what information should be disclosed. By hand, she then made the following notations: "medical (physical) test results; medications prescribed; general progress."

¶ 107. Under the umbrella of "general progress," St. Marys released Charlotte's admission report, some consultation notes, and a discharge report to Dr. Johnson.

¶ 108. In her deposition, Charlotte conceded the possibility that her father required her to provide some medical records if she wanted him to continue paying for her treatment. This can be seen in the following exchange between counsel for Rogers Memorial Hospital and Charlotte:

Q: . . . Do you know if it's possible that your dad required some sort of update on your treatment in exchange for making any types of payments for your medical bills?

A: It's possible. I'm not aware of it, but it is possible.

¶ 109. This concession mirrors Dr. Johnson's sworn statement that "I asked Charlotte to provide me with information regarding her care."

¶ 110. Charlotte waived the confidentiality of the admission report, consultation notes, and discharge

report by signing the release form as she did and by her statements at the deposition.

¶ 111. In any event, Charlotte's voluntary admissions at her deposition duplicate much of the information in these reports.

B. Chapter 905 Waiver

¶ 112. It is undisputed that patients can prevent disclosure of communications made "for purposes of diagnosis or treatment of the patient's physical, mental or emotion condition . . . ." Wis. Stat. § 905.04(2). However, the patient waives this privilege if she voluntarily discloses "any significant part of the matter or communication." Wis. Stat. § 905.11. In this case, the "matter" at issue is whether Charlotte underwent recovered memory therapy. Charlotte and the defendants deny that such therapy occurred. However, Charlotte's voluntary disclosures lead to a different conclusion. Charlotte waived her § 905.04(2) privilege by voluntarily disclosing a "significant part of the matter"—namely, persuasive information that she underwent recovered memory therapy.

¶ 113. The lead opinion summarizes the grounds for waiver:

> [T]he Johnsons claimed that confidentiality did not apply to Phillips' records, and Charlotte otherwise waived her privilege and confidentiality rights by: (1) signing the limited release for her records; (2) providing medical bills to her parents that related to her treatment; (3) confronting her parents about the abuse during her therapy sessions; (4) telling her high school friend, [Nidhi] Jain, that she was in therapy and being hypnotized; (5) filing a restraining order against her parents; (6) communicating with an attorney about commencing a suit against her parents for the abuse she believed she suffered.

Lead op., ¶ 25.

¶ 114. After evaluating each of these grounds in isolation, the lead opinion concludes that Charlotte did not waive her confidentiality privilege. Lead op., ¶ 78. But the grounds cannot be fairly evaluated by considering one, rejecting it, and then considering another afresh, as if no other ground existed. Rather, the grounds should be considered together, as a totality of information.[8]

¶ 115. In furtherance of this purpose, the following is an application of the facts construed in favor of the nonmoving party (the Johnsons), to the legal standard of voluntary disclosure. It reflects two changes from the lead opinion's waiver analysis: First, it considers some additional grounds culled from Charlotte's voluntary admissions at her deposition. Second, it revises the order of presentation. As noted above, some of these grounds individually justify a finding of waiver, and when the grounds are viewed collectively the finding is inescapable.

¶ 116. Charlotte testified at her deposition that she originally entered therapy, in the form of 12–step programs in Alcoholics Anonymous (AA) and Overeaters Anonymous (OA), due to alcohol abuse and an eating disorder, bulimia.

¶ 117. In 1991 she entered the care of Kay Phillips, but she has refused to disclose who referred her to Phillips. Most patients entering treatment for eating

---

[8] The court briefly mentioned a similar "totality of the circumstances" approach in *Harold Sampson Children's Trust v. The Linda Gale Sampson 1979 Trust,* 2004 WI 57, ¶ 30 n.16, 271 Wis. 2d 610, 679 N.W.2d 794. The court did not seriously consider the test, commenting that it would be "difficult to apply." *Id.* On the facts of this case, the totality analysis is not difficult to apply and presents a workable analytic framework.

disorders or alcohol abuse do not undergo recovered memory therapy to treat their problems. We know, however, that many recovered memory therapy patients enter treatment for a disorder other than their memories of abuse. Widom, *Accuracy of Adult Recollections of Childhood Victimization* at 42; Bass, *The Courage to Heal* at 50, 217–19; Wakefield, *Return of the Furies* at 149; *see generally* Pope, *"Recovered Memory" Therapy for Eating Disorders.*

¶ 118. Charlotte's billing records show that after her referral to Kay Phillips, Charlotte received extensive psychotherapy treatment during 1991, 1992, and 1993. While this fact is not determinative of the type of treatment Charlotte received, it provides another data point to consider. The AA 12–step recovery program makes no mention of psychotherapy.[9] The OA 12–step program was adapted directly from the AA program and similarly does not reference psychotherapy.[10] This suggests that Charlotte's therapy progressed beyond limited treatment for an eating disorder or alcohol abuse.[11] At her deposition, Charlotte testified that she believed

[9] Alcoholics Anonymous Recovery Program, available at http://www.alcoholics-anonymous.org/default/en_about_aa_sub.cfm? subpageid=17&pageid=24 (last visited July 1, 2005).

[10] Overeaters Anonymous (OA) Recovery Program, available at http://www.oa.org/twelve_steps.html (last visited July 1, 2005).

[11] This is not to say that a person could not enter psychotherapy as part of treatment for an eating disorder or alcohol abuse. In fact, OA recommends that its patients independently seek psychotherapy. *See* http://www.oa.org/ courier02/courier02.htm (last visited July 1, 2005). However, neither OA nor AA *provides* psychotherapy services as part of a recovery program, meaning that Charlotte's therapy had progressed beyond the "12–step program" level.

her eating disorder and alcohol abuse were symptoms of the fact that she was abused as a child.

¶ 119. Next, as Charlotte testified at several points during her deposition, she began to experience —and experiences to this day—flashbacks to her childhood, and specifically, to memories of childhood abuse. Charlotte also experiences "body memories" of abuse. As discussed above, "body memories" are commonly reported among abuse survivors undergoing recovered memory therapy. Charlotte has somehow preserved these memories despite the fact that she can remember almost nothing else from her life before age 14, and little of her life thereafter. At her deposition, Charlotte had trouble remembering the names of lifelong friends, and testified that she could not remember the names of old roommates, boyfriends, or other acquaintances. It is of course possible to maintain the belief that a patient might experience such flashbacks and body memories absent the use of recovered memory therapy.

¶ 120. At her deposition, Charlotte admitted that she owned *The Courage To Heal,* but claimed that she "never read it." She stated that she bought it because it was "common knowledge" among participants in the types of programs she took part in that she should purchase it. She also admitted that "maybe" she had told her mother to read the book. As already noted, *The Courage to Heal* has been called the " 'Bible' of the recovered memory movement." Wakefield, *Return of the Furies* at 133. It has also been termed the "greatest impetus to the search for memories of forgotten childhood sexual abuse." Eisner, *The Death of Psychotherapy* at 68.

¶ 121. In her affidavit, Nidhi Jain, now a physician, testified that she spoke to Charlotte in 1992 and that Charlotte revealed that "she was being hypnotized

by her therapist." Charlotte denied admitting as much to Jain, but acknowledged that Jain was her "best friend" during high school. Charlotte's admission that she underwent hypnosis is a disputed fact. Nevertheless, the circuit court correctly considered this fact to be true on defendants' motion to dismiss.

¶ 122. The lead opinion concludes that even if this court could find the fact that Charlotte was hypnotized, that would prove nothing. Hypnosis has many uses apart from recovered memory therapy. Nonetheless, evidence of Charlotte's hypnosis is very significant.

¶ 123. The undisputed portion of the puzzle assembled to this point reveals a patient suffering from depression and eating disorders, taking part in psychotherapy, experiencing flashbacks and body memories, and in possession of *The Courage to Heal*. The disputed piece is the admission of hypnosis.

¶ 124. In November 1991, Charlotte asked her father to come to Rogers Memorial Hospital for a meeting. At that meeting, Charlotte openly accused Dr. Johnson and her grandfather of sexual abuse. In October 1993, Charlotte similarly "confronted" her mother, accusing her of physical abuse. These confrontations conform to another belief held by some practitioners of recovered memory therapy—that the patients "can get well only if they 'confront the abuser.' " Watkins, *Dealing With the Problem of "False Memory"* at 301.

¶ 125. As her therapy continued, Charlotte testified that she kept a journal to express her feelings "[o]ff and on since I started recovery probably." Once again, keeping a journal does not link a person to recovered memory therapy, but keeping a journal is often recommended to recovering patients by their therapists. *See*

Bass, *The Courage to Heal* at 145–46; Wakefield, *Return of the Furies* at 145–46. This admission is another piece of circumstantial evidence.

¶ 126. On June 18, 1992, Charlotte filed a petition for a temporary restraining order against her parents and cut off all contact with them. In her accompanying statement of the facts, Charlotte accused her parents of "physical, emotional and sexual abuse" and discussed the confrontation with her father "after *recalling* the sexual abuse." (Emphasis added.) A year later, she wrote to the court requesting renewal of the restraining order alleging that her parents "are perpetrators of incest and physical abuse which has created a *condition* diagnosed by my physicians as *post-traumatic stress disorder.*" (Emphasis added.)

¶ 127. It is unclear from the record whether the Johnsons contested the restraining order. However, had they done so, they could have made a strong argument to obtain Charlotte's medical records under Wis. Stat. § 905.04(4)(c):

> (c) Condition an element of claim or defense. There is no privilege under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense . . . .

¶ 128. With her own words, Charlotte claimed that she had a "condition," namely, "post-traumatic stress disorder," caused by "physical, emotional and sexual abuse" from her parents, and she made this claim in litigation. In *Steinberg v. Jensen,* 194 Wis. 2d 439, 534 N.W.2d 361 (1995), Justice Janine Geske wrote: "Clearly, once a patient-litigant puts his or her

physical, mental, or emotional condition into issue in a lawsuit, any confidential physician-patient communications relating to that issue, including those relevant to discovery under ch. 804, Stats., are not privileged." *Steinberg*, 194 Wis. 2d at 481 (Geske, J., concurring).[12]

¶ 129. The lead opinion concludes, somewhat cryptically, that "[a]lthough Charlotte previously relied on her emotional condition to obtain an injunction, she did not waive her privilege, since she did not have one. As such, there is nothing improper with Charlotte raising her privilege now." Lead op., ¶ 48. This appears to mean that Charlotte waived her privilege for the sole purpose of obtaining the restraining order, and now reasserts it in the present context.

¶ 130. Yet "[o]nce a privilege has been waived, it cannot be invoked at a later time unless the particular privilege so permits."[13] 7 Blinka *Wisconsin Practice: Wisconsin Evidence* § 511.1 at 318 (2d ed. 2001). As

---

[12] Other courts, construing similar privileges, have reached similar conclusions. " 'The whole purpose of the (physician-patient) privilege is to preclude the humiliation of the patient that might follow disclosure of his ailments. When the patient himself discloses those ailments by bringing an action in which they are in issue, there is no longer any reason for the privilege.' " *In re Lifschutz*, 467 P.2d 557, 569 (Cal. 1970) (quoting *City and County of San Francisco v. Superior Court*, 231 P.2d 26, 28 (Cal. 1951)). "The physician-patient privilege . . . [is] to be used for preserving legitimate confidential communications, not for suppressing the truth after the privileged one lets the bars down." *State v. Carter*, 641 S.W.2d 54, 59 (Mo. 1982).

[13] Professor Blinka cites the Fifth Amendment right against self-incrimination, which a person may waive at one hearing and assert at a later one. 7 Blinka *Wisconsin Practice: Wisconsin Evidence* § 511.1 at 318 n.1 (2d ed. 2001). The therapist-patient privilege does not fall within that category.

another court succinctly wrote long ago, "when a secret is out, it is out for all time, and cannot be caught again like a bird, and put back in its cage." *People v. Al-Kanani,* 307 N.E.2d 43, 44 (N.Y. 1973) (quoting *People v. Bloom,* 85 N.E. 824, 826 (N.Y. 1908)). For that reason, in *State v. Johnson,* this court did not allow a litigant who had waived the physician-patient privilege in a prior proceeding to reassert the privilege in a subsequent proceeding. 133 Wis. 2d 207, 225–26, 395 N.W.2d 176 (1986).

¶ 131. The lead opinion also asks the question, "just what was waived [by Charlotte's allegations in her petition for restraining order]?" Lead op., ¶ 49. The lead opinion concludes, in essence, that nothing was waived because Charlotte made no mention of her medical records or her communications to her therapists. *Id.* The lead opinion's interpretation stretches the coverage of the privilege unnecessarily and passes over the well-accepted maxim that the law has a right to every person's evidence and that therefore, privileges are narrowly construed. *See Burnett v. Alt,* 224 Wis. 2d 72, 88, 589 N.W.2d 21 (1999). It is unreasonable to expect a privilege-holder to detail her medical records when disclosing facts about her medical condition. When a patient makes allegations in litigation of abuse based on her medical condition, there is a due process requirement that the accused have some access to the accuser's records. Failure to allow reasonable access would deny the accused the right to present a complete defense.[14] The Johnsons would have had the right to

_____

[14] In criminal cases, the defendant has the right to examine the alleged victim's medical records if (1) the defendant makes a prima facie showing that "the records contain relevant information necessary to a determination of guilt or innocence . . . not merely cumulative to other evidence available to the defen-

examine Charlotte's medical records as a result of Charlotte's petition, and once waived, this privilege may not be reclaimed. This ground alone would justify a finding of waiver.

¶ 132. Continuing our collective analysis, many recovered memory therapists recommend that the patient cut off all contact with her biological family and instead establish a new family within the patient's treatment groups. *See* Bass, *The Courage to Heal* at 305–06; Wakefield, *Return of the Furies* at 143–44. Charlotte's action is consistent with that recommendation. She even changed her name from Charlotte Johnson to Charlotte Dawn.

¶ 133. Finally, the record contains a series of letters sent during 1994 by Charlotte's attorney, Lee Atterbury, to Bruce Gillman, the attorney then representing the Johnsons. In Attorney Atterbury's first letter, dated January 6, 1994, he threatened a lawsuit against the Johnsons as a "civil remedy against her parents for childhood sexual abuse," and offered the possibility of "negotiating a settlement of this matter prior to the commencement of a lawsuit." On February 25, Attorney Atterbury sent Attorney Gillman a detailed settlement proposal consisting of an annuity with lump sum and monthly payments totaling more

dant;" and (2) after an in camera inspection of the records, the court concludes that "the records will likely contain evidence that is independently probative to the defense." *State v. Green,* 2002 WI 68, ¶ 34, 253 Wis. 2d 356, 646 N.W.2d 298.

In civil cases, a party's medical records must be produced if the party places his or her medical condition "in issue." *Ranft v. Lyons,* 163 Wis. 2d 282, 291–92, 471 N.W.2d 254 (Ct. App. 1991). If the records are "in issue," the circuit court may conduct an in camera inspection and redact information not "in issue."

than one million dollars.[15] This proposal apparently was rejected, because on April 6, Attorney Atterbury made very revealing statements in a third letter:

> I have handled cases such as this for many years. I have conversed with and/or corresponded with some of the finest, unbiased minds in both the legal and medical/psychological communities. *I have no doubts as to the validity of repressed memories.*
>
> . . . .
>
> [T]he majority of the reputable therapists in this country *subscribe to the reality of repressed memories.* In my experience, those who have testified to the contrary are either "experts for hire" or members of a bizarre fringe that all but advocate pedophilia as a valid lifestyle. (Emphasis added.)

¶ 134. Even a cursory reading of these letters reveals Attorney's Atterbury's unveiled references to the "validity" and "reality" of repressed memories. The lead opinion admits that the passage "suggests Charlotte discussed the type of therapy she underwent." Lead op., ¶ 52. However, the opinion refuses to conclude that Charlotte waived the privilege on those grounds because any communication between Charlotte and her attorney is privileged. *Id.*

¶ 135. The same cannot be said of the communications between Charlotte's attorney and the Johnsons' attorney. The lead opinion glosses over this distinction, and attempts to excuse the disclosure based on *Harold*

---

[15] Attorney Gillman demanded monthly payments of $1200 for ten years to cover Charlotte's therapy expenses, monthly payments of $2500 for ten years to cover Charlotte's living expenses, a lump sum payment of $100,000 after five years, and a lump sum payment of $500,000 after ten years.

*Sampson Children's Trust v. The Linda Gale Sampson 1979 Trust,* 2004 WI 57, ¶ 46, 271 Wis. 2d 610, 679 N.W.2d 794.

¶ 136. *Sampson* simply does not control this case. In *Sampson,* an attorney inadvertently, but voluntarily, produced privileged documents during discovery because the attorney did not realize that the documents were privileged. *Id., ¶* 4. The court held that under those circumstances, no waiver had occurred because "only the client can waive the attorney-client privilege." *Id.*

¶ 137. This case is much different, because it is inconceivable that Attorney Atterbury's disclosure was inadvertent. It also is impossible to conclude that Charlotte did not have full knowledge of her attorney's activities, as the letters make clear:

> I will forward your letter to my client. That is my duty.

> I will also advise my client that threats of retribution, promises of tough defense, etc., are not new to me.

> . . . .

> I have previously advised my client that litigation of this type can be as nasty and vindictive as the perpetrators' budget allows. ~

¶ 138. In fact, it is hard to escape the conclusion that Charlotte not only knew of these letters, but also caused the letters to be sent. If that is not the case, Charlotte may have a claim of malpractice against her attorney.[16]

---

[16] SCR 20:1.2(a) ("Scope of representation") provides that "A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued." Similarly, SCR 20:1.6(a)

¶ 139. Therefore, the *Sampson* rule does not protect this disclosure because (1) this disclosure was not inadvertent; and (2) the privilege holder (Charlotte) acquiesced in the disclosure.

¶ 140. This ground, too, is enough to justify waiver. It is worth noting once again that the filing of such a lawsuit is recommended in the recovered memory literature as one of the final steps in the recovery process, as it may help lead to closure for the victim. *See* Bass, *The Courage to Heal* at 310.

¶ 141. Despite Charlotte's professed ignorance[17] of the procedures and practices of recovered memory therapy, she had a violent reaction to one question from the plaintiffs' attorney:

Q: Are you presently aware of the controversy about whether or not false memories can be produced by suggestive influences?

A: I believe that's a load of shit, if that's what you're asking me.

¶ 142. It is hard to believe that Charlotte would feel so passionately about a subject she claimed to know very little about.

¶ 143. Given all this information, the grounds for waiver may be summarized as follows: (1) Charlotte

("Confidentiality of information") provides that "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation . . . ."

[17] The following exchange occurred at Charlotte's deposition as the plaintiff's attorney questioned her about books she might have read:

Q: Repressed Memories?

A: I don't know what you're talking about.

disclosed that she entered therapy due to an eating disorder and alcohol abuse before ever having a flashback; (2) she underwent psychotherapy; (3) she was the subject of hypnosis as part of her therapy; (4) she experienced flashbacks and body memories of childhood abuse; (5) she purchased *The Courage to Heal,* the "Bible" of repressed memory therapy; (6) she "confronted" her parents during therapy sessions; (7) she kept a journal and did artwork detailing her experiences; (8) she filed a restraining order against her parents and cut off all contact with them; (9) she changed her name; and (10) she threatened to file a civil lawsuit against her parents, and as part of that threat, her attorney referenced repressed memories. Reference to the literature discussed above reveals that all these events are hallmarks of recovered memory therapy.

¶ 144. When the grounds for waiver are considered singly, it is perhaps possible to conclude that Charlotte did not disclose any significant part of the privileged matter. Considered together, however, it is difficult, if not impossible, to escape the conclusion that she voluntarily admitted undergoing recovered memory therapy. Accordingly, I would hold that Charlotte waived her privilege under Chapter 905 and allow the Johnsons to access her medical records pertaining to recovered memory therapy.

¶ 145. Having reached that conclusion, it becomes necessary to determine the records Charlotte must disclose. Like the lead opinion, I am wary of "fishing expeditions." Accordingly, I join the lead opinion's suggested procedure encompassing in camera review to determine which records should be produced to the plaintiffs. In my view, the court should require production of any of Charlotte's records specifically dealing with recovered or repressed memory therapy.

The court could redact any information not waived, pursuant to *Ranft v. Lyons,* 163 Wis. 2d 282, 292, 471 N.W.2d 254 (Ct. App. 1991).

¶ 146. With these comments and observations, I respectfully concur.

¶ 147. I am authorized to state that Justice JON P. WILCOX joins this opinion's discussion of waiver and Justice N. PATRICK CROOKS joins this opinion in its entirety.

¶ 148. JON P. WILCOX, J. *(concurring in part, dissenting in part).* I agree with Justice Bradley's well-written dissent that "[t]he rationale proffered by the lead opinion in carving out an exception to the patient-therapist privilege and right of confidentiality, and in engrafting criminal procedure to implement the exception, is supported neither by public policy nor precedent." Justice Bradley's dissent, ¶ 152. Therefore, I do not agree with the lead opinion's decision to set up an in camera review procedure of Charlotte's records. *See* lead op., ¶ 71.

¶ 149. However, I wholeheartedly join Justice Prosser's concurrence insomuch as it recognizes that "in this case, numerous undisputed facts show that Charlotte waived her privilege of confidentiality by voluntarily disclosing a significant part of the privileged matter." Justice Prosser's concurrence, ¶ 81. As such, I would allow the Johnsons access to Charlotte's medical records.

¶ 150. ANN WALSH BRADLEY, J. *(dissenting).* This case rests upon the holding in *Sawyer v. Midelfort,* 227 Wis. 2d 124, 595 N.W.2d 423 (1999). There, this court determined that plaintiffs could maintain a third-party negligence claim against a therapist whose treatment allegedly resulted in implanting and reinforcing

false memories of child sexual abuse. *Id.* at 129. However, the holding of *Sawyer* was limited.

¶ 151. The concurring opinion in *Sawyer* wrote separately to "reiterate the narrow scope of the majority's decision based on the unique facts of [the] case." *Id.* at 162 (Wilcox, J. concurring). It sounded a caution that the majority opinion, if expanded, would "place an unreasonable burden on therapists' treatment choices" and undermine the confidentiality that is essential to the patient-therapist relationship. *Id.* The concurrence forewarned of a future day when "[other suits] will soon follow" and of the risks attendant to any future expansion of the majority's limited holding. *Id.* Regrettably, with this case, that day has now arrived.

¶ 152. While I am in concert with the lead opinion in many respects, I cannot agree with its attempted significant expansion of the *Sawyer* court's limited holding. Rather, I embrace the sentiments expressed in the *Sawyer* concurring opinion. The rationale proffered by the lead opinion in carving out an exception to the patient-therapist privilege and right of confidentiality, and in engrafting criminal procedure to implement the exception, is supported neither by public policy nor precedent.

I

¶ 153. The lead opinion, after heralding the substantive right to confidentiality of health care records set forth in Wis. Stat. § 146.82 and the importance of the Wis. Stat. § 905.04 patient-therapist evidentiary privilege, ultimately diminishes both. It concludes that in certain circumstances "public policy requires that the therapist-patient confidentiality and privilege give way to *Sawyer* third-party negligence claims . . . ." Lead op.,

447

¶ 58. It therefore carves out an exception to the privilege and right and establishes a procedure to advance that exception.

¶ 154. If the lead opinion's holding was truly limited to the third-party negligence claim set forth in *Sawyer*, I would probably swallow hard, and obligingly yield to the doctrine of stare decisis. The lead opinion's holding, however, attempts to extend well beyond *Sawyer* in four significant ways.

¶ 155. First, the lead opinion extends the *Sawyer* holding to cases where the substantive right to confidential therapy records is being asserted.

¶ 156. In *Sawyer*, the substantive right to confidentiality of health care records was not in issue. The patient-daughter was deceased, and the Sawyers brought a claim on behalf of the estate. As administrators of their daughter's estate, they already had custody of her therapy records. Here, relying on her substantive right to confidentiality in her therapy records pursuant to Wis. Stat. § 146.82, Charlotte vigorously fought for nondisclosure of the record to her parents.

¶ 157. Second, the lead opinion extends the *Sawyer* holding to cases where the patient-therapist privilege is being asserted.

¶ 158. In *Sawyer*, because the parents brought a claim on behalf of the deceased daughter's estate, they put their daughter's medical condition at issue under Wis. Stat. §§ 804.10 and 905.04(4)(c). As holders of their deceased daughter's patient-therapist privilege, they waived the privilege. Here, Charlotte has fought hard, as holder of the privilege, to assert that privilege.

¶ 159. Third, the lead opinion extends *Sawyer* to general modalities of therapeutic treatment, not just recovered memory therapy.

¶ 160. The holding of the *Sawyer* case was explicitly limited to situations involving recovered memory therapy. Here, the lead opinion acknowledges that it is unclear that the therapy involved was recovered memory therapy. It notes that "a key factual dispute is whether Charlotte underwent recovered memory therapy." Lead op., ¶ 31. Thus, the lead opinion's holding and analysis is extended to allegations of all forms of negligent therapy.

¶ 161. Fourth, the lead opinion enlarges the *Sawyer* holding to other kinds of abuse.

¶ 162. The *Sawyer* court limited its holding to cases involving sexual abuse. The lead opinion expands the scope of cases to also include cases of physical abuse. *See* lead op., ¶¶ 2, 4.

¶ 163. I agree with Judge (now Justice) Roggensack, who authored the court of appeals decision in this case. The court of appeals rejected this expansion of *Sawyer* advanced by the plaintiffs (and now embraced by the lead opinion). Instead it supported the public policy underlying the privilege, that of protecting the free exchange of information between the patient and the therapist. The court of appeals determined that keeping the communication privileged enhances the therapist's ability to provide the needed treatment to the patient. It explained:

> [T]he public policy underlying the privilege, that of encouraging patients to freely and candidly discuss their health care concerns with their health care providers so they may be adequately treated, would be thwarted if patients' health care records were fair game whenever any third-party initiated a lawsuit to which those records might be relevant. Additionally, the legislature has clearly mandated the protection of confi-

449

dential psychologist-patient communications and of patient health care records in Wis. Stat. §§ 905.04 and 146.82(1).

*Johnson v. Rogers Memorial Hosp., Inc.,* 2000 WI App 166, ¶ 17, 238 Wis. 2d 227, 616 N.W.2d 903 (*Johnson I*).

¶ 164. Like the court of appeals, I conclude that a patient's records cannot be "fair game" whenever a suit of this kind is commenced. Such a result would thwart the public policy underlying the patient-therapist evidentiary privilege and undermine the legislative mandate protecting confidential therapy records set forth in Wis. Stat. § 146.82(1).

## II

¶ 165. The lead ·opinion maintains that the Johnsons' claim for financial compensation may prevail over privileged communications and the right to confidential records. In carving out an exception to the privilege and right, the opinion articulates the rationale that impels it to this conclusion.

¶ 166. It cautions that if negligent therapy "is left to flourish within the confines of the therapist-patient relationship, the privilege no longer serves its purpose." Lead op., ¶ 62. The lead opinion observes, "we remain quite confident that negligent treatment which encourages false accusations of sexual abuse is highly culpable for the resulting injury. That culpability also weighs in favor of recognizing a public policy exception to the therapist-patient privilege in this case." *Id.,* ¶ 65 (citations and internal quotation omitted).

¶ 167. Having decided that an exception is desirable, the lead opinion offers as support *Schuster v. Altenberg,* 144 Wis. 2d 223, 424 N.W.2d 159 (1988),

which concluded that exceptions to a general rule of privilege can be waived in the interest of public policy. Lead op., ¶ 70. It then proceeds to craft a public policy exception and a procedure, modeled after a similar criminal law exception refined in *State v. Green,* 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298. Lead op., ¶ 72.

¶ 168. Under the lead opinion's attempted new standard, a plaintiff must "first commence a reasonable investigation into the type of therapy the plaintiff's child underwent." *Id.,* ¶ 74. Afterward, "the plaintiff must set forth a good faith fact-specific basis demonstrating a reasonable likelihood that the records contain information regarding negligent treatment." *Id.* If the plaintiff meets this burden, the court "must proceed to conduct an in camera review regardless of the victim's lack of consent." *Id.,* ¶ 75.

¶ 169. Although well-intentioned, the lead opinion's analysis ultimately proves unconvincing. Its reliance on *Schuster,* as authority for the exception, is misplaced. *Schuster* was a different sort of case altogether.

¶ 170. Edith Schuster, a patient of psychiatrist Dr. Altenberg, was in an automobile accident. She was injured and her passenger, daughter Gwendolyn, was paralyzed. Edith's husband Robert filed suit against Dr. Altenberg, alleging that Edith's psychological condition was responsible for the accident and that Dr. Altenberg was negligent for failing to warn the family of Edith's condition. The court ultimately imposed liability on Dr. Altenberg, holding that "even under the broader ethical duty of confidentiality, this duty finds exception where disclosure is necessary to protect the patient or the community from imminent danger." *Schuster,* 144 Wis. 2d at 252 (citation and internal quotation omitted).

¶ 171. The reasoning of *Schuster* stemmed from the seminal duty-to-warn case, *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976). In that case, Prosenjit Poddar, a patient of psychologist Dr. Moore, killed Tatiana Tarasoff. Tatiana's parents filed suit, alleging that Poddar stated to Dr. Moore his intentions to kill Tatiana and that Dr. Moore was negligent for failing to warn them of their daughter's peril. The court imposed liability on Dr. Moore, holding that "[w]hen a therapist determines . . . that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger." *Tarasoff*, 551 P.2d at 340.

¶ 172. The public safety concerns in *Schuster* and *Tarasoff* are simply not present here. There is no allegation that Charlotte poses a danger to her parents or to the public at large. The only "danger" alleged is damage to the Johnsons' reputation. The Johnsons' claim cannot be seen as on equal footing with the claims put forward by the Schusters or the Tarasoffs.

¶ 173. The standard articulated by the lead opinion today marks a grave departure from traditional privilege standards, as well as from criminal law. The lead opinion models its standard after *Green,* which "refined and heightened the standard to be applied when criminal defendants seek an in camera review of the victim's therapy records." Lead op., ¶ 72. Under *Green,* a defendant must investigate the victim's treatment and make a good faith showing that the records sought are likely to contain relevant information. 253 Wis. 2d 356, ¶¶ 32–33. Once these burdens are met, the court will conduct an in camera review of the records and disclose them to the defendant only if the victim consents. *State v. Solberg,* 211 Wis. 2d 372, 386–87, 564 N.W.2d 775 (1997).

¶ 174. The standard set forth in the lead opinion mirrors *Green,* with the exception of the requirement of consent. "[T]he circuit court must proceed to conduct an in camera review regardless of the victim's lack of consent." Lead op. ¶ 75. The lead opinion reasons that the special circumstances of this case mandate this result, asserting that "requir[ing] Charlotte to give consent to open her medical records makes little sense considering that as a result of the negligent therapy Charlotte understandably wants nothing to do with her parents." *Id.*

¶ 175. This argument fails. No matter how "peculiar" this case may be, Charlotte alone possesses waiver rights. The court recognized this in *Solberg,* requiring a victim's consent before a criminal defendant could access records. Thus, this court found that the interests in preserving privilege outweighed the interests a criminal defendant had in accessing the records. This is significant considering that a criminal defendant faces the ultimate sanction: loss of liberty. *Blanton v. North Las Vegas,* 489 U.S. 538, 542 (1989) (loss of liberty is a more severe form of punishment than any monetary sanction); *In re Winship,* 397 U.S. 358, 366 (1970) (requiring due process safeguards where loss of liberty is at stake). And yet the court today affords the privilege less protection, though the risk to the Johnsons is far less severe than the risk faced by any criminal defendant.

III

¶ 176. The lead opinion may have an admirable goal, but its resolution is not a satisfactory means to that end. As Justice Wilcox cautioned in his *Sawyer* concurrence, this result jeopardizes patient-therapist relationships:

453

> This result would, we believe, place therapists in a difficult position, requiring them to answer to competing demands and to divide their loyalty between sharply different interests . . . . [T]herapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability.

227 Wis. 2d 124, 162 (quoting *Doe v. McKay*, 700 N.E.2d 1018, 1023–24 (Ill. 1998)).

¶ 177. In the end, this is a difficult case and the position the Johnsons find themselves in is not a comfortable one. But this court's sympathy for the plaintiffs should not force our hand.

¶ 178. Ultimately, I agree with the court of appeals' determination that "we have been presented with no argument that causes us to conclude that the Johnsons' interest in financial compensation for the injury they claim to have suffered should trump Charlotte's right to maintain the confidentiality of her privileged communications and health care records." *Johnson I*, 238 Wis. 2d 227, ¶ 18. Accordingly, I respectfully dissent.[1]

¶ 179. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.

---

[1] It is evident that the court is splintered in this case. See lead op. ¶ 3 n. 1; ¶ 4 n. 3 & 4. As such, the lead opinion has no precedential value. Its holding is binding only on the parties here.